## THE STATE v. JOHN F. FERGUSON.

### *Seduction—Evidence.*

1. The paramount and essential ingredient of the crime of seduction, under chapter 248, Laws 1885, is the fact of sexual intercourse *induced by a promise of marriage*, and no conviction can be sustained upon the testimony of the woman unless she is supported upon this essential point.

2. The supporting testimony required by the statute is something more than corroborative evidence—it must be such independent facts and circumstances as will tend to establish her credibility.

3. The woman must be shown to be not only "innocent" (as that term has been interpreted in the statutes relating to the slander of women), but "*virtuous*."

4. Upon the trial of an indictment for seduction, for the purpose of attacking the character of the prosecutrix the defendant offered to prove, by parol, the contents of a note she had written appointing an assignation with another party: *Held*, that such evidence was competent, the paper not being of the class which must be produced before its contents could be proved.

This is an Indictment for Seduction, under promise of marriage, tried before *Meares, J.*, at the August Term, 1889, of MECKLENBURG Criminal Court.

There was a verdict of "guilty," and an appeal by the defendant, and it is necessary to an intelligent understanding of the questions presented by his appeal to state, at some length, the testimony and charge of the Judge below.

Rosa Hargett, the prosecutrix, testified as follows: "The defendant first came to our house, with Jim Trull, in May. I became engaged to him in July, at Bradley's, and I saw him in September and October. Some time during the first days in October he came to our house one night. My father went off to a meeting that night, and my mother went to bed in the other room. He proposed that we should get married next day two weeks. When he proposed that, I

said I would have to go in and ask my mother. I went in, waked her up and asked her, and she consented. When I awoke my mother, I called her, and we talked in a tone loud enough for defendant to hear us. The door was open. We had sexual intercourse that night after I came back, at his solicitation. * * * It was the first and only time I ever had sexual intercourse with any man. * * * The child was born the 18th of June, 1889. The defendant promised to come to see me the next Thursday night week, but he did not come. My father went to town the next day and bought the dry-goods to prepare for my marriage."

Mrs. Hargett, the mother of the prosecutrix, testified : " On the night spoken of by Rosa, she came into my room and waked me up and said the defendant had asked her to marry him and she wanted my consent. After some hesitation I gave my consent, and Rosa went back into the room where the defendant was. She told me the next day that they were to go to Charlotte in about two weeks and get married. When my husband returned, I told him what had occurred and that he must go to town the next day and get dresses, etc., which he did."

Dr. Strong, for the State, testified: "I examined Rosa Hargett on the 26th of April, and found her pregnant. She denied it at first, but afterwards acknowledged it, and said defendant had seduced her, under promise of marriage, in October. The time of the birth of the child fell short of the regular time, but was not below minimum limit."

J. W. Kirkpatrick, the magistrate, testified that when the warrant was sworn out before him, Mr. and Mrs. Hargett said they thought it was the 25th of October when the seduction took place, but Rosa said it was earlier than that. On the preliminary hearing, the defendant admitted that he had intercourse with the prosecutrix, but denied that it was under promise of marriage. This witness and two others testified that the characters of Mr. and Mrs. Hargett and Rosa were good, and the State rested.

The defendant testified, in his own behalf, in substance, that he went to Mr. Hargett's one night to engage a buggy. He (Mr. Hargett) had gone off, and defendant waited for his return. Mrs. Hargett went to bed, and defendant and Rosa were in the next room. He had sexual intercourse with her that night; did not promise her then, or at any other time, to marry her. After sitting some time, told her (Rosa) to go and ask her mother if he could get the buggy; she returned and said that her mother said he could get it; did not hear what was said in the other room; told the magistrate that he had had intercourse with her once, but denied the promise of marriage; never went to see her but once before the night spoken of.

One Garrison, a witness for defendant, testified that, in December, 1889, he and the prosecutrix went out among some cedars to have sexual intercourse, "but was scared off by Martin Wolfe, and he did not have intercourse with her."

James T. Trull, Joe. Trull, Columbus Pressley and M. A. Price, witnesses for defendant, each testified that prior to October, 1888, he had sexual intercourse with the prosecutrix.

The defendant's counsel proposed to prove by one C. Pressley, of these witnesses, that, prior to October, 1888, the prosecutrix had written a note to him, making an assignation with him. The witness stated "that he did not know where the note was—that he had not seen it since he left Pineville, more than a year ago, and that he had not looked for it."

The Solicitor for the State objected to the witness stating the contents of the note. The objection was sustained, and defendant excepted.

Martin Wolfe testified, corroborating the witness Garrison.

Six witnesses for the defendant testified that his character was good, and there was the testimony of a number of witnesses as to the good character of witnesses for defendant.

Four witnesses testified that the character of prosecutrix had been bad for eighteen months, and another testified that " she was considered a fast girl, but he never heard anything against her chastity."

The defendant closed, and the State introduced one Jennings, who testified that the characters of Mr. and Mrs. Hargett and Rosa were good.

The father of the prosecutrix was then introduced by the State, and testified that Joe Trull and Jim Trull had both told him that they never had had intercourse with Rosa, and that defendant was at his house in October, * * * and when he returned that night Mrs. Hargett told him that Rosa and Ferguson would be married in two weeks, and that he must go to town and get dresses, which he did next day.

The defendant asked, in writing, the following instructions:

"1. That the testimony of the prosecutrix, Rosa Hargett, must be supported by other testimony as to the fact that there was a promise of marriage, and that the defendant procured the carnal intercourse by reason of promise of marriage.

2. That there is no evidence in this case supporting the testimony of Rosa Hargett as to the promise of marriage, and the jury must, therefore, acquit the defendant.

3. That upon all the evidence the jury should acquit the defendant."

His Honor refused to give these instructions, and defendant excepted.

His Honor then instructed the jury as follows:

" In other criminal cases a jury may convict the defendant upon the mere naked testimony, unsupported, uncorroborated, of one witness, provided the jury are satisfied, beyond a reasonable doubt, of the guilt of the defendant by the testimony of the witness; the case at Bar, however, forms an exception to this rule. The act of Assembly creating this

offence provides that the defendant shall not be convicted upon "the unsupported testimony" of the woman. It follows, therefore, that if the jury in this case should believe the testimony of the prosecutrix to be true, they are prohibited from convicting the defendant unless there is testimony in the case of a supporting nature. The crime of seduction, under this statute, is made up of three ingredients: 1. There must be act of sexual intercourse. 2. This act must be committed under a promise of marriage. 3. The woman must be in the character of an innocent woman, one who has never had illicit sexual intercourse with a man. You are instructed, in order to convict the defendant, you must be convinced beyond a reasonable doubt: 1. That there was an act of sexual intercourse between the defendant and prosecutrix. 2. That the act was committed under a promise of marriage. 3. That the prosecutrix was an innocent woman—one who had never had illicit sexual intercourse with a man.

"The opposing counsel in this case do not agree in construing the statute. Bear in mind that there must be supporting testimony in order to bring the case within the provisions of the statute. The Court instructs you that if the prosecutrix is supported by the testimony of other witnesses as to the truth of the existence of either one of the three material allegations made by the State, then such supporting testimony would bring the case within the provisions of the statute.

"Is there any supporting evidence in this case as to the act of sexual intercouse? Is there any as to the promise to marry? Is there any as to the innocent character of the woman?" (Here his Honor repeated the testimony.) "It is not necessary that there should be supporting testimony as to each and all three of the issues involved to bring this case within the provisions of the statute.

"The statute does not go so far as that. If there be supporting testimony going to establish the truth of either one of the three allegations made by the State, and which it devolves upon the State to establish, then the case is brought within the intent of the statute. Whether there be any supporting testimony in the case, and the extent of it, and the weight to be attached to it, are questions entirely within the province of the jury."

The jury returned a verdict of "guilty," and there was judgment, from which the defendant appealed, and assigned as errors—

"1. In excluding the evidence of the witness Pressly, as to the contents of the note.

"2. In refusing to give the charges requested.

"3. To that part of his Honor's charge defining the offence."

*The Attorney General,* for the State.

*Messrs. C. W. Tillett* and *P. D. Walker,* for defendant.

DAVIS, J.—after stating the facts:

1. The first exception is to the exclusion of the evidence of the contents of the note.

There are numerous exceptions to the general rule which requires the production of a written instrument as the best and usually only evidence of its contents. Does the note in question fall within any of the exceptions? The note contained no agreement required to be in writing, its contents were purely collateral to the issue, and, as was said by the present Chief Justice, in the case of *State* v. *Credle,* 91 N. C., 648: "It was not intended to be preserved, but to serve a temporary purpose and disappear. * * * It was a loose, casual paper, and what it contained might be proved like any other fact or event. The rule that a written instrument cannot be contradicted, modified or added to by parol proof, has no application to it.

It was competent to speak of it and what it contained, without producing it or showing that it was destroyed or lost." We do not think the note in question comes within the general rule excluding parol evidence of the contents of written instruments, and the evidence should have been admitted. *State* v. *Credle, supra; State* v. *Wilkerson*, 98 N. C., 696; 1 Greenleaf Ev., section 89, and cases cited.

2. The second exception is to the refusal to give the charges requested.

We think the defendant was entitled to the first instruction asked, and if not embraced in substance in the charge of his Honor, as it clearly was not it was error to refuse it, and as the exceptions to the refusal to give the instructions asked and to the charge as given, are kindred in character and rest substantially upon the same grounds, we propose to consider them together.

The act (Laws of 1885, ch. 248) under which the defendant is indicted, declares: "That any man who shall seduce an innocent and virtuous woman under promise of marriage, shall be guilty of a crime, etc.: *Provided, however*, that the unsupported testimony of the woman shall not be sufficient to convict."

His Honor not only refused to give the first instruction asked, but after defining the crime of criminal seduction under the statute, as "made up of three ingredients: 1. There must be the act of sexual intercourse. 2. The act must be committed under promise of marriage. 3. The woman must be in the character of an innocent woman, one who has never had illicit sexual intercourse with a man," and telling the jury "that there must be supporting testimony in order to bring the case within the provisions of the statute," he tells them, in substance, that if the prosecutrix is supported by the testimony of other witnesses as to the truth of the existence of any one of these ingredients, the case is brought within the provisions

of the act, and he then asks: "Is there any supporting evidence in this case as to the act of sexual intercourse?" and of the two other material ingredients, and instructs them if there is, the case is brought within the statute.

We think his Honor's definition of the crime created by the statute is misleading. It is true there can be no crime without sexual intercourse, but there may be sexual intercourse without crime, under the statute.

Sexual intercourse is not made criminal by this statute, nor is seduction made a crime, but it is the *seduction* of an *innocent* and *virtuous woman*, under the *promise of marriage*, and the concurrent presence of a man and woman may be said to be an essential ingredient, whether in the act of sexual intercourse or seduction, without which neither could be committed, but neither one, more than the other, nor is seduction itself a crime under the statute, but the *gravamen* of the offence is the *seduction of an innocent and virtuous woman, under the promise of marriage;* without the *promise* there can be no crime under the statute, whatever may be the character of the woman. Besides, the woman must be virtuous, that is, pure and chaste, as well as innocent.

The purpose of this statute is to protect innocent and virtuous women against wicked and designing men, who know that one of the most potent of all seductive arts is to win love and confidence by promising love and marriage. In section 1113 of *The Code* the word "innocent" is used, which Justice RUFFIN defines, in *State* v. *McDaniel*, 84 N. C., 805, as meaning "a pure woman—one whose character, to use the language of the preamble of the statute, is unsullied."

In *State* v. *Davis*, 92 N. C., 764, "an innocent woman," within the meaning of that section, is defined to be "one who had never had actual illicit intercourse with a man," and mere lasciviousness, and the permission of liberties by men, are not contemplated by the statute; and this definition of the words, "an innocent woman," has been followed

in *State* v. *Horton*, 100 N. C., 447, in construing the word "innocent" in the statute now under review. But the woman must not only be "innocent" but "virtuous." What force, if any, does the word "virtuous" impart to the act?

In *State* v. *Grigg*, 104 N. C., 882, it is said, citing *State* v. *Aldridge*, 86 N. C., 680, that a woman, who at some time in her life has made a "slip in her virtue" is entitled to the protection of section 1113 of *The Code*, if she is "chaste and virtuous" when the slanderous words are uttered.

There is a manifest reason why the words "an innocent woman," in section 1113 of *The Code*, and "innocent and unprotected woman" in section 3763, should be construed to mean innocent of illicit sexual intercourse, as affecting her reputation when the slanderous words are spoken, for the purpose of those sections is to protect women, who, however imprudent they may have been in other respects, have not so far "stooped to folly" as to surrender their chastity and become incontinent, or who have regained their characters if a "slip *has* been made," from "the wanton and malicious slander" of persons who may attempt to destroy their reputations and blast and ruin their characters.

But the act of 1885, recognizing the frailty of man as well as woman, superadds to the word "innocent" the word "virtuous," and before it will condemn and punish the man, who may be seducible as well as seductive, requires that it shall be made to appear that the woman was herself "innocent and virtuous," and that the seduction was compassed by winning her confidence and love under the false and alluring means of a promise of marriage; but, if she willingly surrenders her chastity, prompted by her own lustful passions, or any other motive than that produced by a *promise* of marriage, she is in *pari delecto*, and there is no crime under the statute. She must not only be innocent, but *virtuous*— that is, chaste and pure—and if such a woman yields under the promise of marriage to the "studied, sly, ensnaring art

107—54

* * * dissembling smooth " of the seducer and is betrayed, she deserves sympathy and pity; and he not only deserves the "curse" of all who love honor and virtue, but the severest penalties of the law.

The woman, however, must be "virtuous" as well as "innocent," and this implies something more in her conduct than mere innocence of illicit sexual intercourse. If she willingly submitted to his embraces, the mere promise of marriage would not make it seduction. 33 Mich., 117. And her evidence must be supported. No such proviso is to be found in sections 1113 and 3763. For illustration, there is no evidence that Potipher's wife ever had illicit sexual intercourse with anyone, and yet the idea of a "virtuous woman" would hardly be suggested by her name.

In the case before us, was the evidence of the prosecutrix supported as required by the statute, and was his Honor correct in telling the jury that it was sufficient if she was supported in any one of the three facts, of sexual intercourse, promise of marriage and innocence of the woman, in the sense defined by him? The question of sexual intercourse was not in issue—that was an admitted fact—and, if his Honor was correct, it was needless for him to have told the jury that it was entirely within their discretion to say whether there was any supporting testimony and the weight to be attached to it. He might as well have told them that there was supporting testimony, as the defendant admitted the sexual intercourse, and that was sufficient under the statute.

But we think his Honor erred in his charge. The crime does not consist in the sexual intercourse, nor in the seduction, nor in the innocence and virtue of the woman, but in committing the act under promise of marriage, without which no crime is created by the statute, and which alone makes the seduction criminal, and in this it is not sufficient that the prosecutrix shall be corroborated, but she must be

supported by independent facts or circumstances, and this seems to be the view of the Court in *State* v. *Horton*, 100 N. C., 445, in which the late Chief Justice speaks of the " corroborative evidence" and of the " additional supporting evidence under the statutory requirement" — the supporting evidence in that case being the admission by the defendant to the father that he had promised to marry the prosecutrix.

The supporting evidence need not be an additional witness, or equivalent to the testimony of an additional witness, but, as is said in regard to indictments for perjury, which cannot be sustained upon the simple, unsupported testimony of a single witness, however credible, there must be some independent evidence or circumstance in corroboration. 1 Greenleaf Ev., §§ 257 and 258. And it must be independent of, and other than, that of the prosecutrix. *People* v. *Kenyon*, 5 Parker's Crim. Rep., 288.

The questions presented by the appeal are discussed at length in Bishop on Statutory Crimes, §§ 638 to 652 in *People* v. *Clark*, 33 Mich., 112, and in *Armstrong* v. *People*, 70 N. Y., 38.

In many of the States there is a statutory provision similar to ours, varying in phraseology, that of New York, for instance, using the words, " unmarried female of previous chaste character," but most of them requiring that the prosecutrix shall be supported in her evidence in order to convict.

In the last case cited it is said: " The immediate persuasions which led to compliance may not be proved by the evidence of third persons directly to the fact. They are to be inferred from the facts that the man had the opportunities, more or less frequent and continued, of making the advancements and the proposition; and that the relations of the parties were such as that there was likely to be that confidence on the part of the woman in the asseverations of

devotion on the part of the man, and that affection towards him personally which would overcome the reluctance on her part, so long instilled as to have become natural, to surrender her chastity." As to the *promise* of marriage, the requirement of the statute is satisfied by proof of circumstances which usually attend an engagement of marriage.

The defendant either committed the crime of seduction "under promise of marriage," or there was no crime. The only independent supporting evidence of the promise of marriage was the conversation with her mother when she went to get her consent, if the defendant heard it, and that was a question for the jury, and the second and third instructions asked were properly refused. There is no other evidence or circumstance, except that emanating from her, that is not as consistent with the conclusion that she submitted to the embraces of the defendant voluntarily, and without seductive arts or promises on the part of the defendant, as that she surrendered her chastity because of any promise of marriage, and persuasion or solicitation because of the promise.

In fact, there is a singular absence of facts or circumstances which usually attend engagements or promises to marry. Her father and mother were witnesses for her, and it does not appear that either of them ever had any conversation with the defendant about so important a family matter; it does not appear that he was in the habit of visiting her before the alleged act of seduction, or that he ever visited her after, or that there was any complaint of his failure to do so, or to comply with his alleged promise, till many months after, when the doctor examined her and found her pregnant, which she at first denied, but afterwards said that she had been seduced by the defendant, under promise of marriage. It appears from the testimony of the doctor that the birth of the child was short of the regular time, but within the minimum limit of gestation, and so far from fur-

nishing independent evidence to support that of the prose-cutrix, it tends to throw suspicion upon it.

The prosecutrix says that the illicit intercourse was at the defendant's solicitation, but she does not say, and it only appears inferentially, if at all, that she yielded to his solicitations because of a promise of marriage, and, upon her own testimony, there seems to have been very little seductive art employed.

There were a number of witnesses who testified to illicit intercourse with the prosecutrix, but it was for the jury to say what weight their evidence was entitled to, and they seem to have given none. While we do not and cannot approve or commend the example of an eminent personage who is said "to have sworn to a lie like a gentleman" to protect the reputation of a woman in high social position, we cannot condemn that sentiment which disinclines honest and virtuous jurors to yield ready credence to the testimony of men who expose their own immoral conduct in testifying willingly to their wicked intercourse with a frail woman whose virtue has been assailed. We think, for the reasons stated, there was error.